1

2

3

4

5

6

7

8      SUPERIOR COURT OF WASHINGTON IN AND FOR FRANKLIN COUNTY

9   WASHINGTON TRUST BANK, a
    Washington banking corporation,

10                                            NO.   21-2-50049-11
                        Plaintiff,

11                                            DECLARATION OF CLAIRE BAKER IN
        v.                                    SUPPORT OF MOTION TO APPOINT A
12                                            RECEIVER

    EASTERDAY RANCHES, INC., a
13  Washington corporation; EASTERDAY
    FARMS, a Washington general partnership;
14  CODY EASTERDAY, individually; DEBBY
    EASTERDAY, individually; KAREN
15  EASTERDAY, individually and in her capacity
    as personal representative of the Estate of Gale
16  Easterday,

17                        Defendants.

18

19      I, CLAIRE M. BAKER, hereby make the following declaration:

20      1.      I am over the age of eighteen, not a party hereto, competent to testify as to the

21  matters set forth herein, and I make this declaration based upon my own personal knowledge.

22      2.      I am Vice President Special Assets Team Lead at Washington Trust Bank and I

23  am familiar with this matter.

24

25

DECLARATION OF CLAIRE M. BAKER IN SUPPORT
OF MOTION TO APPOINT A RECEIVER: 1

LAW OFFICES OF
**LUKINS & ANNIS, PS**
A PROFESSIONAL SERVICE CORPORATION
717 W Sprague Ave., Suite 1600
Spokane, WA 99201
Telephone: (509) 455-9555
Fax: (509) 747-2323

01988131  1/29/21

3.     Attached hereto as **Exhibit A** is a true and correct copy of the Promissory Note executed by Easterday Ranches, Inc. ("Ranches") and the general partners of Easterday Farms, a general partnership ("Farms").

4.     Attached hereto as **Exhibit B** is a true and correct copy of the Agricultural Security Agreements executed by Ranches and Farms and true and correct copies of evidence (UCC Financing Statements) showing that Washington Trust Bank ("WTB") duly perfected its security interest in the collateral identified therein.

5.     Attached hereto as **Exhibit C** is a true and correct copy of the Notice of Default that WTB caused its counsel to send to Ranches and Farms.

6.     As of January 29, 2021, the amount owing on the Promissory Note attached hereto as Exhibit A was $44,709,543.11 in principal, $134,703.21 in accrued unpaid interest, plus attorneys' fees and costs.

7.     It is my understanding that Ranches and Farms are presently in possession of crop inventory.  WTB has a senior security interest in that crop inventory and is concerned that this collateral is presently in danger due to, among other things, the conduct that is the subject of a lawsuit brought by Tyson Fresh Meats, Inc. against Ranches.

I hereby declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.


EXECUTED this 29th day of January, 2021, at Spokane, Washington.


CLAIRE M. BAKER

DECLARATION OF CLAIRE M. BAKER IN SUPPORT
OF MOTION TO APPOINT A RECEIVER: 2

LAW OFFICES OF
**LUKINS & ANNIS, PS**
A PROFESSIONAL SERVICE CORPORATION
717 W Sprague Ave., Suite 1600
Spokane, WA 99201
Telephone: (509) 455-0555
Fax: (509) 747-2323

01988131  1/29/21

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of January 2021, I caused to be served a true and correct copy of the foregoing by the method indicated below, and addressed to all counsel of record as follows:

Cody Easterday
5235 N Industrial Way
Pasco, WA, WA 99301
cody@easterdayfarms.com

- [ ] U.S. Mail
- [ ] Hand Delivered
- [ ] Overnight Mail
- [ ] Telecopy (FAX)
- [x] Via email

Peter Richter
Peter Richter:
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
prichter@paladinmgmt.com

- [ ] U.S. Mail
- [ ] Hand Delivered
- [ ] Overnight Mail
- [ ] Telecopy (FAX)
- [x] Via email

R. Crane Bergdahl
6119 Burden Blvd., Suite A
Pasco, WA 99301
P.O. Box 2755
Pasco, WA 99302
cranelaw@msn.com

- [ ] U.S. Mail
- [ ] Hand Delivered
- [ ] Overnight Mail
- [ ] Telecopy (FAX)
- [x] Via email

CHS Capital, LLC dba CHSC NM
5500 Cenex Dr.
Inver Grove Heights, MN 550077

- [ ] U.S. Mail
- [ ] Hand Delivered
- [x] Overnight Mail
- [ ] Telecopy (FAX)
- [ ] Via email

U.S. Small Business Administration
1545 Hawkins Blvd, Suite 202
El Paso, TX 79925

- [ ] U.S. Mail
- [ ] Hand Delivered
- [x] Overnight Mail
- [ ] Telecopy (FAX)
- [ ] Via email

El Paso District Office
915.834.4600
DL0050@sba.gov

- [ ] U.S. Mail
- [ ] Hand Delivered
- [ ] Overnight Mail

DECLARATION OF CLAIRE M. BAKER IN SUPPORT
OF MOTION TO APPOINT A RECEIVER: 3

LAW OFFICES OF
**LUKINS & ANNIS, PS**
A PROFESSIONAL SERVICE CORPORATION
717 W Sprague Ave., Suite 1600
Spokane, WA 99201
Telephone: (509) 455-9555
Fax: (509) 747-2323

01988131  1/29/21

| | | |
|---|---|---|
| | ☐ | Telecopy (FAX) |
| Office of General Counsel | ☒ | Via email |
| 409 3rd Street NW | | |
| Washington, DC 20416 | | |
| Brittany Biles, GC | | |
| Nina Levine, Deputy GC | | |
| General Inquiries: answerdesk@sba.gov | | |

| | | |
|---|---|---|
| AXA Equitable Life Insurance Company | ☐ | U.S. Mail |
| 1290 Avenue of the Americas | ☐ | Hand Delivered |
| New York, NY 10104 | ☒ | Overnight Mail |
| Customer Service: 877.222.2144 | ☐ | Telecopy (FAX) |
| | ☐ | Via email |

| | | |
|---|---|---|
| Equitable Financial Life Insurance Company | ☐ | U.S. Mail |
| 16th Floor, 1290 Avenue of the Americas | ☐ | Hand Delivered |
| New York, NY 10104 | ☒ | Overnight Mail |
| Customer Service: 877.222.2144 | ☐ | Telecopy (FAX) |
| | ☐ | Via email |

| | | |
|---|---|---|
| The Prudential Insurance Company of America | ☐ | U.S. Mail |
| 2100 Ross Avenue, Suite 2500 | ☐ | Hand Delivered |
| Dallas, TX 75201 | ☒ | Overnight Mail |
| Loan Nos. 717611839 & 717611840 | ☐ | Telecopy (FAX) |
| 214.777.4500 | ☐ | Via email |
| 214.721.6007 | | |

| | | |
|---|---|---|
| Rabo Agrifinance, Inc., as Mortgagee | ☐ | U.S. Mail |
| 12443 Olive Blvd, Suite 50 | ☐ | Hand Delivered |
| St. Louis, MO 63141 | ☐ | Overnight Mail |
| 855.722.7766 | ☐ | Telecopy (FAX) |
| CustomerConnect@RaboAg.com | ☒ | Via email |

| | | |
|---|---|---|
| Big Bend Electric Cooperative, Inc. | ☐ | U.S. Mail |
| P.O. Box 348 | ☐ | Hand Delivered |
| Ritzville, WA 99169 | ☐ | Overnight Mail |
| 866.844.2363 | ☐ | Telecopy (FAX) |
| Admin@bbec.org | ☒ | Via email |

LAW OFFICES OF
**LUKINS & ANNIS, PS**
A PROFESSIONAL SERVICE CORPORATION
717 W Sprague Ave., Suite 1600
Spokane, WA 99201
Telephone: (509) 455-9555
Fax: (509) 747-2323

DECLARATION OF CLAIRE M. BAKER IN SUPPORT
OF MOTION TO APPOINT A RECEIVER:  4

01988131  1/29/21

1

_Marianne Love_ (signature)

MARIANNE LOVE, PARALEGAL

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF CLAIRE M. BAKER IN SUPPORT
OF MOTION TO APPOINT A RECEIVER: 5

LAW OFFICES OF
**LUKINS & ANNIS, PS**
A PROFESSIONAL SERVICE CORPORATION
717 W Sprague Ave., Suite 1600
Spokane, WA 99201
Telephone: (509) 455-9555
Fax: (509) 747-2323

01988131  1/29/21

# EXHIBIT A

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $45,000,000.00 | 09-03-2020 | 06-30-2022 | 750140279 | 12 | EAA6216 | 1488 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** EASTERDAY FARMS
EASTERDAY RANCHES, INC.
6235 INDUSTRIAL WAY
PASCO, WA  99301

**Lender:** WASHINGTON TRUST BANK
Kennewick Financial Center
3250 West Clearwater
Kennewick, WA  99336
(800) 788-4578

**Principal Amount:  $45,000,000.00**                    **Date of Note:  August 25, 2020**

**PROMISE TO PAY.**  EASTERDAY FARMS; and EASTERDAY RANCHES, INC. ("Borrower") jointly and severally promise to pay to WASHINGTON TRUST BANK ("Lender"), or order, in lawful money of the United States of America, the principal amount of Forty-five Million & 00/100 Dollars ($45,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance.  Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.**  Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on June 30, 2022.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning September 30, 2020, with all subsequent interest payments to be due on the last day of each month after that.  Unless otherwise agreed or required by applicable law, payments will be applied first to any unpaid collection costs; then to any late charges; then to any accrued unpaid interest as shown on the most recent statement or bill provided to Borrower (if no statement or bill has been provided for any reason, it shall be applied to the unpaid interest accrued since the last payment); and then to principal.

**VARIABLE INTEREST RATE.**  The interest rate on this Note is subject to change from time to time based on changes in an index which is the WASHINGTON TRUST BANK INDEX RATE (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each SAME DATE OF CHANGE IN THE INDEX.  Borrower understands that Lender may make loans based on other rates as well.  The Index currently is 3.250% per annum.  Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.500 percentage points under the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 3.750% per annum based on a year of 360 days.  If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index.  Lender may also amend and adjust the Margin to accompany the substitute index.  The change to the Margin may be a positive or negative value, or zero.  In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable.  Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower.  NOTICE:  Under no circumstances will the interest rate on this Note be less than 3.750% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.**  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**RECEIPT OF PAYMENTS.**  All payments must be made in U.S. dollars and must be received by Lender consistent with the following payment instructions: Only checks or money orders should be sent by mail and all payments must be accompanied by the account number or payment stub. Lender may modify these payment instructions by providing updated payment instructions to Borrower in writing. If a payment is made consistent with Lender's payment instructions but received after 5:00 P.M. Pacific Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.**  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.  Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  WASHINGTON TRUST BANK, Loan Service Center, P.O. BOX 2127 SPOKANE, WA 99210-2127.

**LATE CHARGE.**  If a payment is 30 days or more late, Borrower will be charged **10.000%** of the unpaid portion of the regularly scheduled payment or $20.00, whichever is greater.

**INTEREST AFTER DEFAULT.**  Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 4.000 percentage point margin ("Default Rate Margin").  The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.  If judgment is entered in connection with this Note, interest will continue to accrue after the date of judgment at the rate in effect at the time judgment is entered.  However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.**  Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**  Borrower fails to make any payment when due under this Note.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.**  The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.  This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if

there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change In Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower. Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**MAXIMUM LATE CHARGE.** Borrower acknowledges that the late charge provided in this Note shall be due on interim payments, on maturity and on acceleration of the balance due on this Note. Notwithstanding anything to the contrary in the LATE CHARGES provision in this Note, under no circumstances shall any late charge due on an interim payment, at maturity or on acceleration exceed the sum of $999.99. Borrower acknowledges that the late charge provided in this Note represents the reasonable estimate by Lender and Borrower of a fair average compensation due to the failure of Borrower to make timely payments. Such late charge shall be paid without prejudice to the rights of the Lender to collect any other amounts provided to be paid or to declare a default under this Note or under the Related Documents.

**JUDGMENT.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than one hundred thousand dollars ($100,000.00) against Borrower and the failure by Borrower to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered, shall be deemed an Event of Default hereunder and under the Related Documents.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Washington.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Benton County, State of Washington.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by a Security Agreement dated September 3, 2020 covering substantially all business assets granted by Easterday Farms; a Security Agreement dated September 3, 2020 covering substantially all business assets granted by Easterday Ranches, Inc.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all requests for advances be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **CODY EASTERDAY; DEBBY EASTERDAY; GALE EASTERDAY; KAREN EASTERDAY; and/or CODY EASTERDAY.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**AFFIRMATIVE COVENANTS.** Borrower covenants and warrants that as long as this Note or any Related Documents remain in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings, or similar actions affecting Borrower or any Guarantor which do or could exceed one hundred thousand dollars ($100,000.00).

**Financial Records.** Maintain its books and records in accordance with accepted accounting principles, in form and substance satisfactory to Lender, applied on a consistent basis. Permit Lender to examine, audit, and copy such books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following: (1) As soon as available, but in no event later than one-hundred- fifty (150) days after the end of each fiscal year or within the required time period specified in any loan agreement between Borrower and Lender, Borrower's financial statement for the year ended, in form and substance satisfactory to Lender, and (2) such additional financial or other information, statements, and certifications, in form and substance satisfactory to Lender, as Lender may require or request.

**SURVIVAL OF REPRESENTATIONS AND WARRANTIES.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Note or in any certificate or other instrument delivered by Borrower to Lender under this Note or any Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of any Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's indebtedness shall be paid in full, or until this Note or any Related Documents shall be terminated, whichever is the last to occur.

**NO WAIVER BY LENDER.** Lender shall not be deemed to have waived any rights under this Note unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Note shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Note. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Guarantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under the Note, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of

Lender.

**NOTICE OF FINAL AGREEMENT. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER STATE LAW.**

**COUNTERPARTS.** This Agreement may be executed in multiple counterparts, each of which, when so executed, shall be deemed an original but all such counterparts, taken together, shall constitute one and the same Agreement.

**NON-LIABILITY OF LENDER.** The relationship between Borrower and Lender created by this Agreement is strictly a debtor and creditor relationship and not fiduciary in nature, nor is the relationship to be construed as creating any partnership or joint venture between Lender and Borrower. Borrower is exercising Borrower's own judgment with respect to Borrower's business. All information supplied to Lender is for Lender's protection only and no other party is entitled to rely on such information. There is no duty for Lender to review, inspect, supervise or inform Borrower of any matter with respect to Borrower's business. Lender and Borrower intend that Lender may reasonably rely on all information supplied by Borrower to Lender, together with all representations and warranties given by Borrower to Lender, without investigation or confirmation by Lender and that any investigation or failure to investigate will not diminish Lender's right to so rely.

**AUTOMATIC EXTENSION.** Provided the Note is not in default and at the sole discretion of the Lender, the Borrower may be granted the right to extend the maturity of this note for up to two (2) calendar months.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: WASHINGTON TRUST BANK Loan Service Center P.O. BOX 2127 SPOKANE, WA 99210-2127.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

EASTERDAY FARMS

By: _____

CODY     EASTERDAY,   General   Partner   of
EASTERDAY FARMS

By: _____

GALE     EASTERDAY,   General   Partner   of
EASTERDAY FARMS

EASTERDAY RANCHES, INC.

By: _____

CODY   EASTERDAY,   President   of   EASTERDAY
RANCHES, INC.

By: _____

DEBBY     EASTERDAY,   General   Partner   of
EASTERDAY FARMS

By: _____

KAREN     EASTERDAY,   General   Partner   of
EASTERDAY FARMS

LaserPro, Ver. 20.2.0.042  Copr. Finastra USA Corporation 1997, 2020.  All Rights Reserved.  - WA  z:\CFI\MANC\FILPL\D20.FC  TR 315871  PR 88 (M)



*0930*

## PARTNERSHIP AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $45,000,000.00 | 09-03-2020 | 06-30-2022 | 750140279 | 12 | EAA6216 | 1488 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** EASTERDAY FARMS
EASTERDAY RANCHES, INC.
5235 INDUSTRIAL WAY
PASCO, WA 99301

**Lender:** WASHINGTON TRUST BANK
Kennewick Financial Center
3250 West Clearwater
Kennewick, WA 99336
(800) 788-4578

**Partnership:** EASTERDAY FARMS
5235 INDUSTRIAL WAY
PASCO, WA 99301

IN CONSIDERATION OF the existing or proposed lending or banking relationship between EASTERDAY FARMS; and EASTERDAY RANCHES, INC. ("Borrower") and WASHINGTON TRUST BANK ("Lender"), and between EASTERDAY FARMS ("the Partnership") and Lender, the persons signing below jointly and severally and on behalf of the Partnership represent and certify to Lender that:

**THE PARTNERSHIP'S EXISTENCE.** The complete and correct name of the Partnership is EASTERDAY FARMS ("Partnership"). The Partnership is a partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Washington. The Partnership is duly authorized to transact business in all other states in which the Partnership is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Partnership is doing business. Specifically, the Partnership is, and at all times shall be, duly qualified as a foreign partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Partnership has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Partnership maintains an office at 5235 INDUSTRIAL WAY, PASCO, WA 99301. Unless the Partnership has designated otherwise in writing, the principal office is the office at which the Partnership keeps its books and records. The Partnership will notify Lender prior to any change in the location of the Partnership's principal office address or any change in the Partnership's name. The Partnership shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Partnership and the Partnership's business activities.

**AUTHORIZATIONS ADOPTED.** At a meeting of the partners of the Partnership, duly called and held on **September 3, 2020**, or by other duly authorized action in lieu of a meeting, the agreements and authorizations set forth in this Authorization were adopted.

**PARTNERS.** The following named persons are partners of EASTERDAY FARMS:

| NAMES | TITLES | AUTHORIZED | | ACTUAL SIGNATURES |
|---|---|---|---|---|
| CODY EASTERDAY | General Partner | Y | X | |
| DEBBY EASTERDAY | General Partner | Y | X | |
| GALE EASTERDAY | General Partner | Y | X | |
| KAREN EASTERDAY | General Partner | Y | X | |

**ACTIONS AUTHORIZED.** Any four (4) of the authorized persons listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Partnership. Specifically, but without limitation, any four (4) of such authorized persons are authorized, empowered, and directed to do the following for and on behalf of the Partnership:

**Borrow Money.** To borrow, as a cosigner or otherwise, from time to time from Lender, on such terms as may be agreed upon between the Partnership and Lender, such sum or sums of money as in their judgment should be borrowed, without limitation.

**Execute Notes.** To execute and deliver to Lender the promissory note or notes, or other evidence of the Partnership's credit accommodations, on Lender's forms, at such rates of interest and on such terms as may be agreed upon, evidencing the sums of money so borrowed or any of the Partnership's indebtedness to Lender, and also to execute and deliver to Lender one or more renewals, extensions, modifications, refinancings, consolidations, or substitutions for one or more of the notes, any portion of the notes, or any other evidence of credit accommodations.

**Grant Security.** To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to the Partnership or in which the Partnership now or hereafter may have an interest, including without limitation all of the Partnership's real property and all of the Partnership's personal property (tangible or intangible), as security for the payment of any loans or credit accommodations so obtained, any promissory notes so executed (including any amendments to or modifications, renewals, and extensions of such promissory notes), or any other or further indebtedness of the Partnership to Lender at any time owing, however the same may be evidenced. Such property may be mortgaged, pledged, transferred, endorsed, hypothecated or encumbered at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated or encumbered.

**Execute Security Documents.** To execute and deliver to Lender the forms of mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require and which shall evidence the terms and conditions under and pursuant to which these liens and encumbrances, or any of them, are given; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances. Notwithstanding the foregoing, any one of the above authorized persons may execute, deliver, or record financing statements.

**Negotiate Items.** To draw, endorse, and discount with Lender all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to the Partnership or in which the Partnership may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to the Partnership's account with Lender, or to cause such other disposition of the proceeds derived therefrom as they may deem advisable.

**Further Acts.** In the case of lines of credit, to designate additional or alternate individuals as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements as the partners may in their discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Authorization. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from the Partnership, at Lender's address shown above, written notice of revocation of such authority: **CODY EASTERDAY; DEBBY EASTERDAY; GALE EASTERDAY; KAREN EASTERDAY; and/or CODY EASTERDAY.**

**ASSUMED BUSINESS NAMES.** The Partnership has filed or recorded all documents or filings required by law relating to all assumed business names used by the Partnership. Excluding the name of the Partnership, the following is a complete list of all assumed business names under which the Partnership does business: **None.**

**JOINT AND SEVERAL LIABILITY.** Each partner agrees to be jointly and severally liable for all of the Partnership's present and future obligations to Lender.

**MULTIPLE BORROWERS.** The Partnership may enter into transactions in which there are multiple borrowers on obligations to Lender and the Partnership understands and agrees that, with or without notice to the Partnership, Lender may discharge or release any party or collateral securing an obligation, grant any extension of time for payment, delay enforcing any rights granted to Lender, or take any other action or inaction, without the loss to Lender of any of it rights against the Partnership; and that Lender may modify transactions without the consent of or notice to anyone other than the party with whom the modification is made.

**NOTICES TO LENDER.** The Partnership will promptly notify Lender in writing at Lender's address shown above (or such other addresses as

21-80010-WLH    Doc 1-9    Filed 04/12/21    Entered 04/12/21 17:17:03    Pg 11 of 33

Lender may designate from time to time) prior to any (A) change in the Partnership's name; (B) change in the Partnership's assumed business name(s); (C) change in the partners of the Partnership, including the addition of new partners or the departure of current partners from the Partnership; (D) change in the authorized signer(s); (E) change in the Partnership's principal office address; (F) change in the Partnership's state of organization; (G) conversion of the Partnership to a new or different type of business entity; or (H) change in any other aspect of the Partnership that directly or indirectly relates to any agreements between the Partnership and Lender. No change in the Partnership's name, state or organization, or principal office address will take effect until after Lender has received notice.

**CERTIFICATION CONCERNING PARTNERS AND AUTHORIZATIONS.** The partners named above are duly elected, appointed, or employed by or for the Partnership, as the case may be, and occupy the positions set opposite their respective names. This Authorization now stands of record on the books of the Partnership, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Authorization and performed prior to the passage of this Authorization are hereby ratified and approved. This Authorization shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Partnership's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF,** we have hereunto set our hand and attest that the signatures set opposite the names listed above are their genuine signatures.

We each have read all the provisions of this Authorization, and we each jointly and severally and on behalf of the Partnership certify that all statements and representations made in this Authorization are true and correct. This Partnership Authorization is dated September 3, 2020.

CERTIFIED TO AND ATTESTED BY:

X _____
CODY EASTERDAY, General Partner of EASTERDAY FARMS

X _____
DEBBY EASTERDAY, General Partner of EASTERDAY FARMS

X _____
GALE EASTERDAY, General Partner of EASTERDAY FARMS

X _____
KAREN EASTERDAY, General Partner of EASTERDAY FARMS

NOTE: If the partners signing this Authorization are designated by the foregoing document as one of the partners authorized to act on the Partnership's behalf, it is advisable to have this Authorization signed by at least one non-authorized partner of the Partnership.

LaserPro, Ver. 20.2.0.043 Copr. Finastra USA Corporation 1997, 2020. All Rights Reserved. - WA c/CFI/WIN/CFILPL/C95.FC TR-215371 PR-99

# EXHIBIT B

# AGRICULTURAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $45,000,000.00 | 09-03-2020 | 06-30-2022 | 750140279 | 12 | EAA6216 | 1488 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** EASTERDAY FARMS
EASTERDAY RANCHES, INC.
5235 INDUSTRIAL WAY
PASCO, WA 99301

**Grantor:** EASTERDAY FARMS
5235 INDUSTRIAL WAY
PASCO, WA 99301

**Lender:** WASHINGTON TRUST BANK
Kennewick Financial Center
3250 West Clearwater
Kennewick, WA 99336
(800) 788-4578

THIS AGRICULTURAL SECURITY AGREEMENT dated September 3, 2020, is made and executed among EASTERDAY FARMS ("Grantor"); EASTERDAY FARMS; and EASTERDAY RANCHES, INC. ("Borrower"); and WASHINGTON TRUST BANK ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, In addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All goods, equipment, farm equipment, inventory, fixtures, accounts, deposit accounts, chattel paper, documents, general intangibles, instruments, investment property and letter of credit rights**

The Collateral includes any and all of Grantor's present and future inventory (including consigned inventory), related equipment, goods, merchandise and other items of personal property, no matter where located, of every type and description, including without limitation any and all of Grantor's present and future raw materials, components, work-in-process, finished items, packing and shipping materials, containers, items held for sale, items held for lease, items for which Grantor is lessor, goods to be furnished under contract for services, materials used or consumed in Grantor's business, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and any and all additions thereto and substitutions or replacements therefor, and all accessions, attachments, and accessions thereto, whether added now or later, and all products and proceeds derived or to be derived therefrom, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guarantees of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto. Inventory includes inventory temporarily out of Grantor's possession or custody and all returns on accounts, chattel paper and instruments.

The Collateral includes any and all of Grantor's present and future chattel paper, equipment leases, retail installment contracts, notes and chattel mortgages, notes and security agreements, instruments, documents, and all other similar obligations and indebtedness that may now and in the future be owed to or held by Grantor from whatever source arising, and all monies and proceeds payable thereunder, and all of Grantor's rights and remedies to collect and enforce payment and performance thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future rights, title and interest in and with respect to the goods or other property that may give rise to or that may secure any of the foregoing, including without limitation Grantor's insurance rights with regard thereto, and all present and future general intangibles of Grantor in any way related or pertaining to any of the foregoing, including without limitation Grantor's account ledgers, books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto.

The Collateral includes any and all of Grantor's present and future accounts, accounts receivable, other receivables, contract rights, instruments, documents, notes, and all other similar obligations and indebtedness that may now and in the future be owed to or held by Grantor from whatever source arising, and all monies and proceeds payable thereunder, and all of Grantor's rights and remedies to collect and enforce payment and performance thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future rights, title and interest in and with respect to the goods, services, and other property that may give rise to or that may secure any of the foregoing, including without limitation Grantor's insurance rights with regard thereto, and all present and future general intangibles of Grantor in any way related or pertaining to any of the foregoing, including without limitation Grantor's account ledgers, books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto.

The Collateral includes any and all of Grantor's now owned and hereafter acquired equipment, machinery, furniture, furnishings and fixtures of every type and description, and all accessories, attachments, accessions, substitutions, replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation any equipment purchased with the proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future chattel paper, instruments, notes and monies that may be derived from the sale, lease or other disposition of any of the foregoing, any rights of Grantor to collect or enforce payment thereof as well as to enforce any guaranties of the foregoing and security therefor, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation, or use of the foregoing, and any rights of Grantor with regard thereto.

The Collateral includes all general intangibles, choses in action and causes of action and all other intangible personal property and rights of Grantor of every nature and kind, now owned or hereafter acquired, including without limitation corporate or other business records, inventions, designs, blueprints, plans, specifications, patents, patent applications, trade marks, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, tax refund claims, insurance proceeds, including without limitation insurance covering the lives of key employees on which Grantor is beneficiary, and any letter of credit, guaranty, claim, security interest, or other security held or granted to Grantor to secure payment of any indebtedness.

The Collateral includes any and all of Grantor's now owned or hereafter acquired farm equipment or agricultural machinery, equipment, furnishings and fixtures of every type and description, and all accessories, attachments, accessions, substitutions, replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation any equipment purchased with the proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, chattel paper, instruments, notes and monies that may be derived from the sale, lease or other disposition of any of the foregoing, any rights of Grantor to collect or enforce payment thereof as well to enforce any guaranties of the foregoing and security therefor, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation, or use of the foregoing, and any rights of Grantor with regard thereto.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due,

direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**BORROWER'S WAIVERS AND RESPONSIBILITIES.** Except as otherwise required under this Agreement or by applicable law, (A) Borrower agrees that Lender need not tell Borrower about any action or inaction Lender takes in connection with this Agreement; (B) Borrower assumes the responsibility for being and keeping informed about the Collateral; and (C) Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Collateral or any delay by Lender in realizing upon the Collateral; and Borrower agrees to remain liable under the Note no matter what action Lender takes or fails to take under this Agreement.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (A) this Agreement is executed at Borrower's request and not at the request of Lender; (B) Grantor has the full right, power and authority to enter into this Agreement and to pledge the Collateral to Lender; (C) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (D) Lender has made no representation to Grantor about Borrower or Borrower's creditworthiness.

**GRANTOR'S WAIVERS.** Grantor waives all requirements of presentment, protest, demand, and notice of dishonor or non-payment to Borrower or Grantor, or any other party to the Indebtedness or the Collateral. Lender may do any of the following with respect to any obligation of any Borrower, without first obtaining the consent of Grantor: (A) grant any extension of time for any payment, (B) grant any renewal, (C) permit any modification of payment terms or other terms, or (D) exchange or release any Collateral or other security. No such act or failure to act shall affect Lender's rights against Grantor or the Collateral.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above, or at the location specified in the Collateral definition in this Agreement, or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of Inventory, Grantor shall not remove the Collateral from its existing locations without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Washington, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell Inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds one hundred thousand dollars ($100,000), whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Borrower, any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrowers, any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business or the death of any partner, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Washington Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower or Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding or pending foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**AFFIRMATIVE COVENANTS.** Grantor covenants and warrants that as long as this Agreement or any Related Documents remain in effect, Grantor will:

**Financial Records.** Maintain correct and accurate records of the Collateral and permit Lender to examine, audit, and copy such records at all reasonable times.

**Collateral.** Furnish Lender with schedules or lists of the Collateral, in form and substance satisfactory to Lender, as Lender may require or request.

**SURVIVAL OF REPRESENTATIONS AND WARRANTIES.** Grantor understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Grantor in this Agreement or in any certificate or other instrument delivered by Grantor to Lender under this Agreement or any Related Documents. Grantor further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of any Related Documents, shall be continuing in nature, shall be deemed made and redated by Grantor at the time each Loan Advance is made, and shall remain in full force and effect until such time as Grantor's or Borrower's Indebtedness shall be paid in full, or until this Agreement or any Related Documents shall be terminated, whichever is the last to occur.

**JUDGMENT.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than one hundred thousand dollars ($100,000.00) against Grantor and the failure by Grantor to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered, shall be deemed an Event of Default hereunder and under the Related Documents.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this

Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Benton County, State of Washington.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Agreement shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Agreement. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Agreement.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Borrower's or Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Borrower and Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Subject to applicable law, and except for notice required or allowed by law to be given in another manner, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Subject to applicable law, and except for notice required or allowed by law to be given in another manner, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Counterparts.** This Agreement may be executed in multiple counterparts, each of which, when so executed, shall be deemed an original but all such counterparts, taken together, shall constitute one and the same Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Agricultural Security Agreement, as this Agricultural Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Agricultural Security Agreement from time to time.

**Borrower.** The word "Borrower" means EASTERDAY FARMS; and EASTERDAY RANCHES, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means EASTERDAY FARMS.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means WASHINGTON TRUST BANK, its successors and assigns.

**Note.** The word "Note" means the Note dated September 3, 2020 and executed by EASTERDAY FARMS; and EASTERDAY RANCHES, INC. in the principal amount of $45,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

BORROWER AND GRANTOR HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGRICULTURAL SECURITY AGREEMENT AND AGREE TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 3, 2020.

**GRANTOR:**

By: _____
CODY   EASTERDAY,   General   Partner   of
EASTERDAY FARMS

By: _____
GALE   EASTERDAY,   General   Partner   of
EASTERDAY FARMS

By: _____
DEBBY   EASTERDAY,   General   Partner   of
EASTERDAY FARMS

By: _____
KAREN   EASTERDAY,   General   Partner   of
EASTERDAY FARMS

**BORROWER:**

By: _____
CODY   EASTERDAY,   General   Partner   of
EASTERDAY FARMS

By: _____
GALE   EASTERDAY,   General   Partner   of
EASTERDAY FARMS

By: _____
DEBBY   EASTERDAY,   General   Partner   of
EASTERDAY FARMS

By: _____
KAREN   EASTERDAY,   General   Partner   of
EASTERDAY FARMS

EASTERDAY RANCHES, INC.
By: _____
CODY   EASTERDAY,   President   of   EASTERDAY
RANCHES, INC.

LaserPro, Ver. 20.2.0.043  Copr. Finastra USA Corporation 1997, 2020.  All Rights Reserved.  - WA  L:\CFI\WIN\CFI\LPL\E40.FC  TR-21563/1  PR-50 (M)

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company 800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
WAFilings@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Corporation Service Company
801 Adlai Stevenson Dr
Springfield, IL 62703
USA

Date of Filing : 09/04/2020
Time of Filing : 10:55:00 AM
File Number    : 2020-248-2584-7
Lapse Date     : 09/04/2025

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EASTERDAY FARMS | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 5235 INDUSTRIAL WAY | PASCO | WA 99301 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Washington Trust Bank | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| PO Box 2127 | Spokane | WA 99210-2127 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All goods, equipment, farm equipment, inventory, crops (wherever grown or stored), farm products, fixtures, accounts, deposit accounts, chattel paper, documents, general intangibles, instruments, investment property and letter of credit rights; whether any of the foregoing is now existing or hereafter raised or grown; all accessions, additions, replacements, and substitutions relating to any of the foregoing (including all entitlements, rights to payment, and payments, in whatever form received, including but not limited to, payments under any governmental agricultural diversion programs, governmental agricultural assistance programs,

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
:EAA6216 [197938817]

Continuation of section 4 collateral

4. This FINANCING STATEMENT covers the following collateral:

the Farm Services Agency Wheat Feed Grain Program, and any other such program of the United States
Department of Agriculture, or any other general intangibles or programs); all records of any kind relating
to any of the foregoing.

2020-248-2584-7

# AGRICULTURAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $45,000,000.00 | 09-03-2020 | 06-30-2022 | 750140279 | 12 | EAA6216 | 1488 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "****" has been omitted due to text length limitations.

| | | |
|---|---|---|
| **Borrower:** | EASTERDAY FARMS<br>EASTERDAY RANCHES, INC.<br>5235 INDUSTRIAL WAY<br>PASCO, WA 99301 | **Lender:** WASHINGTON TRUST BANK<br>Kennewick Financial Center<br>3250 West Clearwater<br>Kennewick, WA 99336<br>(800) 788-4578 |
| **Grantor:** | EASTERDAY RANCHES, INC.<br>5235 INDUSTRIAL WAY<br>PASCO, WA 99301 | |

THIS AGRICULTURAL SECURITY AGREEMENT dated September 3, 2020, is made and executed among EASTERDAY RANCHES, INC. ("Grantor"); EASTERDAY FARMS; and EASTERDAY RANCHES, INC. ("Borrower"); and WASHINGTON TRUST BANK ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All goods, equipment, farm equipment, inventory, fixtures, accounts, deposit accounts, chattel paper, documents, general intangibles, instruments, investment property and letter of credit rights**

The Collateral includes any and all of Grantor's present and future inventory (including consigned inventory), related equipment, goods, merchandise and other items of personal property, no matter where located, of every type and description, including without limitation any and all of Grantor's present and future raw materials, components, work-in-process, finished items, packing and shipping materials, containers, items held for sale, items held for lease, items for which Grantor is lessor, goods to be furnished under contract for services, materials used or consumed in Grantor's business, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and any and all additions thereto and substitutions or replacements therefor, and all accessories, attachments, and accessions thereto, whether added now or later, and all products and proceeds derived or to be derived therefrom, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto. Inventory includes inventory temporarily out of Grantor's possession or custody and all returns on accounts, chattel paper and instruments.

The Collateral includes any and all of Grantor's present and future chattel paper, equipment leases, retail installment contracts, notes and chattel mortgages, notes and security agreements, instruments, documents, and all other similar obligations and indebtedness that may now and in the future be owed to or held by Grantor from whatever source arising, and all monies and proceeds payable thereunder, and all of Grantor's rights and remedies to collect and enforce payment and performance thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future rights, title and interest in and with respect to the goods or other property that may give rise to or that may secure any of the foregoing, including without limitation Grantor's insurance rights with regard thereto, and any and all present and future general intangibles of Grantor in any way related or pertaining to any of the foregoing, including without limitation Grantor's account ledgers, books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto.

The Collateral includes any and all of Grantor's present and future accounts, accounts receivable, other receivables, contract rights, instruments, documents, notes, and all other similar obligations and indebtedness that may now and in the future be owed to or held by Grantor from whatever source arising, and all monies and proceeds payable thereunder, and all of Grantor's rights and remedies to collect and enforce payment and performance thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future rights, title and interest in and with respect to the goods, services, and other property that may give rise to or that may secure any of the foregoing, including without limitation Grantor's insurance rights with regard thereto, and all present and future general intangibles of Grantor in any way related or pertaining to any of the foregoing, including without limitation Grantor's account ledgers, books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto.

The Collateral includes any and all of Grantor's now owned and hereafter acquired equipment, machinery, furniture, furnishings and fixtures of every type and description, and all accessories, attachments, accessions, substitutions, replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation any equipment purchased with the proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, notes and monies that may be derived from the sale, lease or other disposition of any of the foregoing, any rights of Grantor to collect or enforce payment thereof as well as to enforce any guaranties of the foregoing and security therefor, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation, or use of the foregoing, and any rights of Grantor with regard thereto.

The Collateral includes all general intangibles, choses in action and causes of action and all other intangible personal property and rights of Grantor of every nature and kind, now owned or hereafter acquired, including without limitation corporate or other business records, inventions, designs, blueprints, plans, specifications, patents, patent applications, trade marks, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, tax refund claims, insurance proceeds, including without limitation insurance covering the lives of key employees on which Grantor is beneficiary, and any letter of credit, guaranty, claim, security interest, or other security held or granted to Grantor to secure payment of any indebtedness.

The Collateral includes any and all of Grantor's now owned or hereafter acquired farm equipment or agricultural machinery, equipment, furnishings and fixtures of every type and description, and all accessories, attachments, accessions, substitutions, replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation any equipment purchased with the proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, chattel paper, instruments, notes and monies that may be derived from the sale, lease or other disposition of any of the foregoing, any rights of Grantor to collect or enforce payment thereof as well as to enforce any guaranties of the foregoing and security therefor, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation, or use of the foregoing, and any rights of Grantor with regard thereto.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due,

direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**BORROWER'S WAIVERS AND RESPONSIBILITIES.** Except as otherwise required under this Agreement or by applicable law, (A) Borrower agrees that Lender need not tell Borrower about any action or inaction Lender takes in connection with this Agreement; (B) Borrower assumes the responsibility for being and keeping informed about the Collateral; and (C) Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Collateral or any delay by Lender in realizing upon the Collateral; and Borrower agrees to remain liable under the Note no matter what action Lender takes or fails to take under this Agreement.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (A) this Agreement is executed at Borrower's request and not at the request of Lender; (B) Grantor has the full right, power and authority to enter into this Agreement and to pledge the Collateral to Lender; (C) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (D) Lender has made no representation to Grantor about Borrower or Borrower's creditworthiness.

**GRANTOR'S WAIVERS.** Grantor waives all requirements of presentment, protest, demand, and notice of dishonor or non-payment to Borrower or Grantor, or any other party to the Indebtedness or the Collateral. Lender may do any of the following with respect to any obligation of any Borrower, without first obtaining the consent of Grantor: (A) grant any extension of time for any payment, (B) grant any renewal, (C) permit any modification of payment terms or other terms, or (D) exchange or release any Collateral or other security. No such act or failure to act shall affect Lender's rights against Grantor or the Collateral.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above, or at the location specified in the Collateral definition in this Agreement, or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of Inventory, Grantor shall not remove the Collateral from its existing locations without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Washington, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral.. . Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurances as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral exceeding one hundred thousand dollars ($100,000.00), whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Borrower, any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's, any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business or the death of any partner, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Washington Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower or Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and any other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding or pending foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**AFFIRMATIVE COVENANTS.** Grantor covenants and warrants that as long as this Agreement or any Related Documents remain in effect, Grantor will:

**Financial Records.** Maintain correct and accurate records of the Collateral and permit Lender to examine, audit, and copy such records at all reasonable times.

**Collateral.** Furnish Lender with schedules or lists of the Collateral, in form and substance satisfactory to Lender, as Lender may require or request.

**SURVIVAL OF REPRESENTATIONS AND WARRANTIES.** Grantor understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Grantor in this Agreement or in any certificate or other instrument delivered by Grantor to Lender under this Agreement or any Related Documents. Grantor further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of any Related Documents, shall be continuing in nature, shall be deemed made and redated by Grantor at the time each Loan Advance is made, and shall remain in full force and effect until such time as Grantor's or Borrower's Indebtedness shall be paid in full, or until this Agreement or any Related Documents shall be terminated, whichever is the last to occur.

**JUDGMENT.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than one hundred thousand dollars $100,000.00) against Grantor and the failure by Grantor to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered, shall be deemed an Event of Default hereunder and under the Related Documents.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this

Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Benton County, State of Washington.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Agreement shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Agreement. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Agreement.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Borrower's or Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Borrower and Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Subject to applicable law, and except for notice required or allowed by law to be given in another manner, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Subject to applicable law, and except for notice required or allowed by law to be given in another manner, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Counterparts.** This Agreement may be executed in multiple counterparts, each of which, when so executed, shall be deemed an original but all such counterparts, taken together, shall constitute one and the same Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Agricultural Security Agreement, as this Agricultural Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Agricultural Security Agreement from time to time.

**Borrower.** The word "Borrower" means EASTERDAY FARMS; and EASTERDAY RANCHES, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means EASTERDAY RANCHES, INC..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means WASHINGTON TRUST BANK, its successors and assigns.

**Note.** The word "Note" means the Note dated September 3, 2020 and executed by EASTERDAY FARMS; and EASTERDAY RANCHES, INC. in the principal amount of $45,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**BORROWER AND GRANTOR HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGRICULTURAL SECURITY AGREEMENT AND AGREE TO ITS TERMS. THIS AGREEMENT IS DATED September 3, 2020.**

GRANTOR:

EASTERDAY RANCHES, INC.

By: _____
CODY EASTERDAY, President of EASTERDAY
RANCHES, INC.

BORROWER:

EASTERDAY FARMS

By: _____
CODY EASTERDAY, General Partner of
EASTERDAY FARMS

By: _____
GALE EASTERDAY, General Partner of
EASTERDAY FARMS

By: _____
DEBBY EASTERDAY, General Partner of
EASTERDAY FARMS

By: _____
KAREN EASTERDAY, General Partner of
EASTERDAY FARMS

EASTERDAY RANCHES, INC.

By: _____
CODY EASTERDAY, President of EASTERDAY
RANCHES, INC.

LaserPro, Ver. 20.2.0.043 Copr. Finastra USA Corporation 1997, 2020. All Rights Reserved. - WA. E:\CFI\WIN\CFI\LPL\E40.FC SR-215271 PR-50 (M)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
WAFilings@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Corporation Service Company
801 Adlai Stevenson Dr
Springfield, IL 62703
USA

Date of Filing : 09/04/2020
Time of Filing : 10:53:00 AM
File Number : 2020-248-2583-0
Lapse Date : 09/04/2025

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EASTERDAY RANCHES, INC. | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5235 INDUSTRIAL WAY | PASCO | WA | 99301 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Washington Trust Bank | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PO Box 2127 | Spokane | WA | 99210-2127 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

All goods, equipment, farm equipment, inventory, fixtures, accounts, deposit accounts, chattel paper, documents, general intangibles, instruments, investment property and letter of credit rights; whether any of the foregoing is now existing or hereafter raised or grown; all accessions, additions, replacements, and substitutions relating to any of the foregoing (including all entitlements, rights to payment, and payments, in whatever form received, including but not limited to, payments under any governmental agricultural diversion programs, governmental agricultural assistance programs, the Farm Services Agency Wheat Feed Grain

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
:EAA6216 [197938824]

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

2020-248-2583-0

4. This FINANCING STATEMENT covers the following collateral:

Program, and any other such program of the United States Department of Agriculture, or any other general intangibles or programs); all records of any kind relating to any of the foregoing.

PAGE 2 OF 2                                    2020-248-2583-0

# EXHIBIT C

| LUKINS&ANNIS | ATTORNEYS

717 W Sprague Ave, Ste 1600
Spokane, WA 99201-0466
t 509-455-9555
f 509-747-2323    lukins.com

TREVOR R. PINCOCK
tpincock@lukins.com

January 26, 2021
*VIA U.S. MAIL*
*VIA CERTIFIED MAIL*

Easterday Ranches, Inc.
5235 Industrial Way
Pasco, WA 99301
cody@easterdayfarms.com

Easterday Farms
5235 Industrial Way
Pasco, WA 99301
cody@easterdayfarms.com

Cody Easterday
830 Bellflower Road
Mesa, WA 99343-9564
cody@easterdayfarms.com

Debby Easterday
830 Bellflower Road
Mesa, WA 99343-9564
debby@easterdayfarms.com

Karen Easterday
631 Bellflower Road
Mesa, WA 99343-9564

The Estate of Gale Easterday
Karen Easterday, Personal Representative
631 Bellflower Road
Mesa, WA 99343-9564

Re:    Washington Trust Bank Loan No. -0279
       Notice of Default

Mr. Easterday and Mss. Easterday:

Lukins & Annis, P.S. represents Washington Trust Bank ("WTB").

On or about August 25, 2020, Easterday Ranches, Inc. and Easterday Farms, a general partnership, executed a Promissory Note in favor of WTB evidencing a line of credit in the amount of $45,000,000.00, and secured the line of credit by executing Agricultural Security Agreements ("Loan -0279"). Cody Easterday, Debby Easterday, Gale Easterday, and Karen Easterday each executed a Commercial Guaranty by which they absolutely and unconditionally guaranteed Loan -0279.

This letter serves as notice that Easterday Ranches, Inc. and Easterday Farms are in default on Loan -0279. The death of Gale Easterday and the lawsuit that Tyson Fresh Meats Inc. filed in Franklin County Superior Court against Easterday Ranches Inc. are events that constitute default under the terms of Loan -0279. The death of Mr. Easterday constitutes an event affecting a guarantor, an event affecting a general partner, and a change in ownership; and Tyson's lawsuit constitutes a material adverse change in financial condition and as a result of

the lawsuit WTB believes the prospect of payment or performance of the Promissory Note is impaired and believes itself insecure.

As a result of the defaults, WTB reserves all rights and remedies available to it under the terms of Loan -0279 and may immediately implement those rights and remedies.

Please let me know if you have any questions.

Best regards,

TREVOR R. PINCOCK
TRP:trp

cc:     Crane Bergdahl
        6119 Burden Blvd., Ste. A
        PO Box 2755
        Pasco, WA 99302

01942483